[Crim. No. 4797.   First Dist., Div. Two.   Apr. 20, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. JUNE FURBER, Defendant and Appellant.

Vincent Hallinan, Carl B. Shapiro, Patrick Sarsfield Hallinan and LeRoy W. Rice for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., and Robert R. Granucci, Deputy Attorneys General, for Plaintiff and Respondent.

TAYLOR, J.—Defendant, June Furber, appeals from a judgment rendered on a jury verdict finding her guilty of voluntary manslaughter (Pen. Code, § 192, subd. 1). The chief

contention on appeal involves the introduction into evidence of her statement admitting the shooting of the deceased, Michael Chingoon, her former husband. For the reasons set out hereafter, we have concluded that in view of *People* v. *Dorado,* 62 Cal.2d 338, 353-356 [42 Cal.Rptr. 169, 398 P.2d 361], the statement should have been excluded and its admission compels a reversal of the judgment. We reject defendant's other contentions that the evidence showed that the homicide was justifiable as a matter of law, and that the trial court erred in instructing the jury and in denying her motion for probation.

The basic facts are not in dispute. Defendant and Michael Chingoon were married in 1957 and had two children born in 1958 and 1959, respectively. The marriage was a stormy one and there was ample evidence that from 1957 until 1961 the deceased repeatedly physically assaulted defendant. Several witnesses had observed or heard quarrels and various acts of violence between the parties and confirmed the fact that defendant was in fear of her husband. Defendant made several complaints to the district attorney's office in 1957 and 1961 but did not mention any threats on her life.

In 1957-1958 and 1959-1960 defendant sought the advice of her obstetrician, Dr. Cheek. The doctor talked to Chingoon and concluded that he had tendencies toward paranoid and pre-psychotic behavior and that both parties could benefit from psychiatric help. .

In 1960 decedent attempted to carry out his previous threats to kill defendant but she succeeded in ·dissuading him. Defendant realized her husband was mentally ill and she bore him no hatred. The parties finally separated and defendant sought a divorce after Dr. Cheek advised her that the decedent was likely to harm her or the children. Early in 1961 defendant obtained an interlocutory decree of divorce. Chingoon opposed the divorce and never accepted or recognized it. He broke into defendant's home in violation of several restraining orders. After one such incident in April 1961 defendant became fearful of her safety and that of the children. She took the children to Hawaii, where she remained for about a year. She returned to San Francisco pursuant to court order. She then obtained a final decree of divorce and a modification of the custody provisions, thereby securing full custody of both children. The contempt charges against her for taking the children to Hawaii in violation of the previous court orders were discharged.

After her return from Hawaii, defendant lived on the

second floor of a two-flat building she owned at 1130 Lake Street. Chingoon operated a service station nearby at 500 Masonic Avenue and undertook a considerable campaign of harassment against her, involving telephone calls and acts of vandalism to her home, her automobile, her guests and their automobiles. His telephone calls threatening to kill defendant were heard by several witnesses. Maryam Razavi, defendant's roommate from July 1962 until January 1963 heard the telephone threats. Chingoon also personally told Miss Razavi that he was going to kill defendant. Margaret Bedford, defendant's roommate from January 1963 to January 1964 heard similar threats. Both roommates testified that Chingoon called defendant several times a week, often late at night, and upset her. Defendant was still very fearful of Chingoon.

In February 1964 Chingoon tried to break into defendant's apartment. After a telephone threat in March 1964 defendant talked to her attorney about committing Chingoon but was advised that additional restraining orders were more appropriate. Defendant slept with a meat cleaver for protection but in March 1964 bought a .38 caliber gun. She kept the gun loaded on a nearby bookcase at night but, for the children's safety, she unloaded it and hid it in a garment bag in the closet during the daytime. Despite the many threats, there was no evidence that the deceased ever physically assaulted defendant after 1961.

Under the terms of the final decree and the modified custody provisions, Chingoon was permitted to see his children every two weeks but was forbidden to set foot in defendant's home. Accordingly, every other Saturday, Chingoon came to defendant's flat, walked up the stairs, rang the bell and then took a step back and waited for the door to open and the children to be sent to him, one at a time. Defendant always had the children ready and as often as possible tried to have someone else with her. She was careful to open the door in such a way that Chingoon could not see her, as she had been told that Chingoon's rages could be produced by the sight of her face.

On Saturday morning, April 25, 1964, Chingoon called his friend, Bernard Gelinas, and asked him whether he would accompany Chingoon to pick up the children as Gelinas had done in the past. Gelinas declined. About 10 a.m., Chingoon arrived in his truck at 1130 Lake Street, walked up the stairs and rang the bell, as was his custom.

The door opened and he was shot three times. Some of the

many witnesses to the shooting testified that he was shot once at the top of the stairs, that he backed or slipped half way down the stairs where he was shot two more times, and then fell to the sidewalk. Others testified that the three shots were fired in rapid succession. The autopsy disclosed that the deceased had suffered three gunshot wounds caused by .38 caliber bullets, one in the chest and two in the back. Either of the back wounds could have caused his death.

Some of the witnesses immediately notified the police of the shooting. When Inspector Willett arrived at defendant's flat at 10:25 a.m., Officer O'Connor was already there. The two officers interviewed defendant in her living room where a .38 caliber revolver with three expended casings and two live loads in its cylinder was lying on the table. Defendant told Inspector Willett she was afraid of the deceased because he had made threats on her life and had tried to kill her. She also stated that she was not expecting the decedent to come to her home that morning because he had called the evening before to tell her that he would not be picking up the children. When she heard someone at the front door, she opened it, expecting the mailman or some friends. When she saw her former husband, she closed the door and went back to get her gun. Chingoon was pounding on the door. She opened the door and fired at him but did not know how many times.

Defendant's testimony regarding the events of April 25 varied substantially from her statement to the officers. She testified she did not remember whether the deceased had telephoned her the evening before but she knew he was not coming to pick up the children that Saturday; she did not remember bathing the children or giving them breakfast that morning. She could not remember anything that happened that morning after she saw Chingoon, closed the door and heard him repeatedly pound on it. She did not recall talking to Inspector Willett. She only remembered that later in the afternoon of the same day when she was at the city prison, she wanted to talk to her attorney before signing a document releasing Chingoon's body, as she was not certain that as his divorced wife she was the nearest relative.

■ We turn first to the admissibility of the statement made by defendant to Officer O'Connor and Inspector Willett a few minutes after the shooting on April 25, 1964. The trial court admitted the statement, after distinguishing it from statements ruled inadmissible in *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and *Massiah* v. *United States,* 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246], on the

basis that in the instant case the defendant did not request counsel before her statement was taken.

In *Escobedo,* the U. S. Supreme Court held that "where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, *the suspect has requested and been denied an opportunity to consult with his lawyer,* and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' *Gideon* v. *Wainwright,* 372 U.S., at 342 [9 L.Ed.2d at 804, 93 A.L.R.2d 733], and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." [Italics added.] (84 S.Ct. 1758, 12 L.Ed2d 977 at 986.)

However, in *People* v. *Dorado,* 62 Cal.2d 338, 346-347 [42 Cal.Rptr. 169, 398 P.2d 361], our Supreme Court held that the basic reasoning of the court's opinion in *Escobedo* did not permit a formalistic distinction based on the failure of the accused to *request counsel.* Subsequently, the court ruled, in *In re Lopez,* 62 Cal.2d 368 [42 Cal.Rptr. 188, 398 P.2d 380], that *Dorado* would apply to all judgments which had not become final before the decision in *Escobedo* [i.e., before June 22, 1964]. Thus in the instant case, the fact that defendant *did not request counsel* is not a distinguishing feature permitting her statement to be admitted into evidence.

The People contend that *Escobedo* is not applicable because, at the time of her statement, the investigation was not yet in the accusatory stage and had not focused on defendant. The People argue that the investigation was still at the stage of general inquiry as the police officers were merely attempting to ascertain what had happened and whether a public offense had in fact been committed. Although the abstract principle of law argued by the People is correct *(People* v. *Modesto,* 62 Cal.2d 436, 446 [42 Cal.Rptr. 417, 398 P.2d 753], the record does not support its application in the instant case.

Inspector Willett, who questioned defendant within a short time after the shooting, testified as follows: "Q. At the time you started to talk to her, you knew, or you had reason to suspect that she was the person who had fired the gun that had killed Chingoon; is that right? A. Well, yes, sir. Q. You

heard nothing at all about any question about any attorney? A. Not there at the house." After establishing that Officer O'Connor was also present, the following ensued: "Q. Now, did you hear Officer O'Connor say to June Furber that she had nothing to fear, that this was a justifiable homicide, if ever there was one? A. Yes, sir, he made that statement. He had talked to her before, I understood."

This testimony indicates that even before the arrival of Inspector Willett, the investigation had focused on defendant and had reached the accusatory stage. Nor can it be doubted that defendant was in custody even though she was being questioned in her own living room. The fact that she was the sole and obvious suspect, together with the presence of the two officers, definitely establishes that she was under arrest at the time her statement was taken (cf. Pen. Code, §§ 834, 835; *People* v. *Jenkins,* 232 Cal.App.2d 323, 326 [42 Cal. Rptr. 654]; *People* v. *Stewart,* 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97]). It is clear that had she attempted to leave the scene, she would have been restrained.

The record shows that defendant was not advised of her right to counsel or of her right to remain silent before she was interrogated by Inspector Willett. Defendant could have waived her constitutional rights under the Sixth Amendment, but, as held in *Dorado, supra,* at 352, the court can find no waiver unless there is evidence that she was aware of her rights. Her later request for an opportunity to talk to an attorney to determine whether she was authorized to sign a document releasing the decedent's body, does not establish that she was cognizant of her rights at the crucial time when her initial statement was taken. Although defendant attempted to exculpate herself by contending that she was fearful of the deceased, her statement was so incriminating that it was tantamount to a confession. In *Dorado,* the court held that an improperly obtained confession is always prejudicial and its admission constitutes reversible error. Assuming, *arguendo,* that her statement was an admission and not a full confession, it was so prejudicial in this case, particularly in view of her completely divergent testimony at the trial where she claimed unconsciousness, that in viewing the entire record, we conclude that article VI, section 4½ of the state Constitution is clearly not applicable and the judgment must be reversed (*People* v. *Watson,* 46 Cal.2d 818 at p. 835 [299 P.2d 243]; *People* v. *Martinez, ante,* p. 251 [43 Cal.Rptr. 630]).

■ Defendant's contention that the evidence shows, as a matter of law, that the homicide was justifiable, is not borne

out by the record. Justifiable homicide, so far as here relevant, is defined by section 197 of the Penal Code.[1] Section 198[2] provides that the circumstances which will justify a homicide must be such as to excite the fear of a reasonable person and that the bare fear actually experienced by an individual defendant is not sufficient. It is uncontroverted that on the day of the shooting, the deceased had made no hostile move toward defendant or her children. Defendant admitted that, despite the many telephone threats, the decedent had not physically assaulted her since 1961; his attempt to break into her home in February of 1964 was successfully stopped after defendant asked the downstairs neighbors to slam their door so he would know that someone was in the building. Defendant and one witness testified that they heard Chingoon pounding on the door just before the shooting. None of the other witnesses heard or saw any pounding. The verdict of voluntary manslaughter indicates that the jury did not believe defendant's version of the facts. ■ The weight to be afforded the evidence and the resolution of its conflicts, as well as the reasonableness of defendant's fears and her use of the gun, were matters for jury determination (*People* v. *McAuliffe*, 154 Cal.App.2d 332 [316 P.2d 381]).

■ Defendant also challenges the instructions given to the jury on the subject of self-defense, and argues that the jury should have been instructed to apply a subjective standard of fear rather than the objective standard set forth by

[1] ''Homicide is also justifiable when committed by *any* person in any of the following cases:

''1. When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person; or

''2. When committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein; or

''3. When committed in the lawful defense of such person, or of a wife or husband, parent, child, master, mistress, or servant of such person, when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or the person in whose behalf the defense was made, if he was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed; . . .''

[2] ''A bare fear of the commission of any of the offenses mentioned in subdivisions two and three of the preceding section, to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone.'' [Enacted 1872.]

686

section 198 of the Penal Code, quoted above. The instructions given were proper in view of the conflicting state of the evidence relating to self-defense (*People* v. *Zuckerman,* 56 Cal. App.2d 366 [132 P.2d 545]). Defendant's contentions concerning the greater wisdom of the subjective standard followed by a minority of jurisdictions (40 C.J.S. § 126, pp. 1005-1007) are better addressed to the Legislature than to this court.

In view of our conclusion that defendant's statement was erroneously introduced, we need not discuss in detail her contention based on *People* v. *Mercer,* 210 Cal.App.2d 153 [26 Cal.Rptr. 502], that when the prosecution introduced her statement as part of its case in chief, the jury was bound to accept her claim that she was acting in self-defense when she shot Chingoon. However, as we have noted previously, defendant's statement does not clearly establish a case of self-defense, while in *Mercer* there was no evidence incompatible with defendant's version of the shooting which established self-defense as a matter of law.

■ Defendant's argument that the trial court erred in refusing to instruct the jury on involuntary manslaughter is without merit. She argues that the jury could have concluded from the evidence that she fired the gun with the intent only to frighten and not to shoot the deceased and that the act was not done in the exercise of the right of self-defense. The record discloses no facts that warrant the inference that the killing occurred under any of the circumstances set forth in subdivision 2 of section 192 of the Penal Code defining involuntary manslaughter.[3] Defendant testified that she did not remember what happened after she closed the door on the deceased. A psychiatrist testified that she could have been in a state medically known as "hysterical fugue" and thus not in conscious control of her acts at the time of the killing. Thus, the alternative theories of the defense at the trial were those of self-defense and unconsciousness (Pen. Code, § 26, subd. Five). There was no evidence that the killing was accidental or due to carelessness, nor did the defense make any such contentions.

■ Where there is no evidence to support a verdict of involuntary manslaughter, no instructions thereon should be given (*People* v. *Bufarale,* 193 Cal.App.2d 551 [14 Cal.Rptr. 381];

[3]"Involuntary—in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection; provided that this subdivision shall not apply to acts committed in the driving of a vehicle."

*People* v. *Dugger,* 179 Cal.App.2d 714, 721-722 [4 Cal.Rptr. 388]).

Defendant, relying on *People* v. *Alotis,* 60 Cal.2d 698 [36 Cal.Rptr. 443, 388 P.2d 675], argues that the trial court erroneously decided that she was ineligible for probation. In that case, the defendant entered a guilty plea to assault with a deadly weapon (Pen. Code, § 245), an offense punishable either as a felony or a misdemeanor, and was sentenced to one year in the county jail. The sentence was suspended and the defendant granted probation. On appeal, the People argued that since the defendant was armed with a deadly weapon, the trial court was without power to grant probation under the third and fourth paragraphs of section 1203 of the Penal Code, which provide that probation cannot be granted to any defendant who uses a deadly weapon in connection with the perpetration of a crime. The Supreme Court, after commenting on the often criticized and confusing language of the various parts of section 1203 of the Penal Code, affirmed the grant of probation. The opinion was based, in part, on the trial court's finding that, because the defendant was not consciously aware of her acts, the gun was not used as a deadly weapon (*People* v. *Southack,* 39 Cal.2d 578 [248 P.2d 12]) and also on a determination that the offense was a misdemeanor. The Supreme Court concluded that the provisions of the third and fourth paragraphs of section 1203 of the Penal Code applied only to felonies, and that since the defendant had been convicted of a misdemeanor for all purposes after judgment (Pen. Code § 17), the court had the power to grant probation under the second paragraph of section 1203.

▮ In the instant case, the triers of fact rejected the defense testimony that defendant was acting unconsciously. in firing at the victim when they returned a verdict of guilty to voluntary manslaughter (Pen. Code, § 192, subd. 1), a felony (Pen. Code, § 193), thus making defendant ineligible for probation under the Supreme Court's interpretation of the third and fourth paragraphs of section 1203 of the Penal Code in *People* v. *Alotis, supra.*

The judgment is reversed.

Shoemaker, P. J., and Agee, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied June 16, 1965. McComb, J., Mosk, J., and Burke, J., were of the opinion that the petition should be granted.