[Crim. No. 10359.   Second Dist., Div. Three.   Nov. 18, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. STUFF McGEE, Defendant and Appellant.

Eric A. Rose, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Plaintiff and Respondent.

KAUS, J.—A jury found defendant guilty of a violation of section 487, subd. 3 of the Penal Code—grand theft, automobile. Reversal is sought on the basis that the admission of certain statements by defendant violated the rule of *Escobedo* v. *Illinois*, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], as applied in *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].

Apart from the statements mentioned, the prosecution's case was rather meager: on January 22, 1964, one Frank J. White was the owner of a 1961 Corvair Monza, California license JUT 063, serial number 109270-132927. At 10:30 p.m. that day he parked it at a downtown parking lot and locked it, taking the keys with him. He apparently worked a night shift and when he returned at 9 a.m. the next morning the car was gone. He had not given anyone permission to take his vehicle and had never met defendant until he saw him in the courtroom at the time of the preliminary examination. Shown certain keys and California license plates PQD 569, which had been taken from the car when it was later recovered, White testified that they were not his. He had never applied for different plates.

At about 2 a.m. on April 11, 1964, defendant was involved in an automobile accident while driving the car in question. He received some injuries about the head.

Officers Schiller and Pallas of the Los Angeles Police Department investigated the accident. They found the Corvair with the PQD 569 license plates on it at the scene and found a suspense receipt from the Department of Motor Vehicles in the car. This receipt made out to F. J. or D. White identified the Corvair by its serial number. It was apparently made out when the PQD 569 license plates were issued in lieu of those numbered JUT 063. The receipt also showed an address, 345-3/4 West 68th Street, written in a different handwriting from the rest.[1]

The officers then sought out defendant at a receiving hospital and he identified himself as the driver of the Corvair. There is no issue concerning the admissibility of that conversation. The officers eventually returned to their station to make out their reports, checked the serial number of the car against a list of numbers of cars reported stolen and discovered that the Corvair had been so reported when its license plates were JUT 063. The car, which had been impounded after the accident for safekeeping, was "reimpounded" for investigation. At that time the keys were removed from the car. There were what Officer Schiller called "miscellaneous papers" in the car, some of which had the defendant's name on them. He then went to see defendant at his home, 934 West 68th Street and arrested him. At that time he obtained what we will call the "first statement."

---

[1]Defendant later testified that at one point he had lived at 345-1/2 West 68th Street.

The officers gave conflicting testimony concerning the precise moment when defendant was placed under arrest. Officer Schiller first testified that McGee had already been placed under arrest when the statement was obtained, but later changed his mind and said that the arrest took place afterwards. His partner, Officer Pallas, said that the arrest came later. As far as we are concerned, the point is immaterial. There were five officers in all who came to defendant's home in the early morning hours after the accident. Defendant was asleep. Officer Pallas awakened him and asked him to get out of bed and to get dressed. Under these facts it is obvious that he had already formed the intent to make an arrest, since it is not to be supposed that considerations of delicacy prevent a police officer from talking to a male suspect in his pajamas. It is clear that if defendant had wanted to leave, he would have been stopped. The situation is similar to the one discussed in *People* v. *Furber,* 233 Cal.App.2d 678, 684 [43 Cal.Rptr. 771]. (See also *People* v. *Bostick,* 62 Cal.2d 820, 835, fn. 5 [44 Cal.Rptr. 649, 402 P.2d 529].)

Although admittedly no warning of any kind was given, it is argued that the statement obtained from defendant after he was thus placed in custody is nevertheless admissible, because the questioning was "investigatory" rather than accusatory, in other words the type of questioning mentioned in *People* v. *Stewart,* 62 Cal.2d 571, 578 [43 Cal.Rptr. 201, 400 P.2d 97], by reference to *United States* v. *Konigsberg,* 336 F.2d 844, 853.

In *Konigsberg* it was held that an incriminating statement was not inadmissible, in spite of the lack of a caution, where "The *uncontradicted* purpose of the discussion was to give Konigsberg a chance to explain . . . to hear Konigsberg's side of the story. . . ." (Italics added.)

The dictum in *Stewart* that questioning of a suspect in custody may result in admissible incriminating statements if its purpose is not to elicit such a statement, but to give the suspect an opportunity to explain, was recently applied in a somewhat different context by a unanimous court in *People* v. *Cotter,* 63 Cal.2d 386 [46 Cal.Rptr. 622, 405 P.2d 862], where it was said: "Neither this court, nor the United States Supreme Court has ever taken the position that the desire of a guilty man to confess his crime should be stifled, impeded, discouraged or hindered in any way. The contrary is true." (63 Cal.2d 386, 396.) (See also *People* v. *Cully,* 236 Cal.App.2d 769, 774-775 [46 Cal.Rptr. 644] : "In adopting the *Konigsberg*

rule that a suspect may be asked for his explanation a reasonable time after his arrest, we believe the Supreme Court sought to maintain free communication between suspect and officer for reasons beneficial to both suspect and society—beneficial to the suspect by encouraging early communication which could lead to his speedy release, and beneficial to society by continuing to use to advantage the tendency of guilty persons to confess all on first being caught.'')

It may well be that in spite of the fact that the officers had made up their mind to arrest defendant the purpose of their questioning was to give him an opportunity to give a satisfactory explanation of his having driven a stolen car and that, if he had come up with one, they would have released him. The trouble with the People's position is that there were before the trial court two radically different versions of the behavior of the officers. If defendant's account is to be believed, we would be hard put to say that the accusatory stage had not been reached. Unfortunately the trial judge never made a finding on the disputed questions of fact surrounding the making of the statement. Therefore we cannot assume that the police version is correct.

Defendant testified that when the officers arrived at his home and arrested him he immediately said: ''I would like to talk to my lawyer before I go to jail.'' An officer told him that he would have to wait until he got to the station. At that time an officer had already made an outright assertion that defendant had stolen the automobile. Defendant only answered questions after this accusation was made and after he was denied the right to call an attorney.

The Supreme Court was faced with a very similar problem in *People* v. *Schader,* 62 Cal.2d 716, 727 [44 Cal.Rptr. 193, 401 P.2d 665]. That case unlike the one at bench was tried before the decision in *Escobedo.* Schader claimed, as did McGee, that a statement of his was involuntary because he was not allowed to see an attorney. The police said, as they did here, that defendant made no such request. The jury was instructed not to consider the statement, which was a confession, if Schader had requested and been denied counsel. The court made no preliminary determination on the factual issue. The Supreme Court held that whether a confession is claimed to be involuntary, or voluntary but inadmissible under the *Escobedo-Dorado* rule, our own cases (*People* v. *Gonzales,* 24 Cal.2d 870, 876-877 [151 P.2d 251]) and the United States Constitution demand an independent deter-

mination by the court whether or not the confession is admissible. (*Jackson* v. *Denno,* 378 U.S. 368 [84 S.Ct. 1774, 12 L.Ed.2d 908, 1 A.L.R.2d 1205].) As *Schader* demonstrates, the fact that in making such a determination the court may have to pass on the credibility of witnesses, does not relieve it of that burden.[2]

In the instant case the record is clear that the court did not perform its function. During the argument on the admissibility of the statements given by defendant the court made the remarks set forth in the footnote, which preclude us from indulging in any presumption to the effect that the court disbelieved defendant's version.[3]

---

[2]It should be noted that when the Evidence Code goes into effect, the court will be the sole trier of preliminary facts on which the admissibility of confessions depends and that the jury will not be instructed to disregard a confession admitted by the court if its findings on the preliminary facts which determine admissibility, conflict with those of the court. (Evid. Code, § 405 and official comment thereto.) If the confession is admitted, the defendant may of course introduce all evidence relevant to weight or credibility. (Evid. Code, § 406.) This procedure will cause California to follow what has been described as the ''Wigmore or Orthodox'' rule. See *Jackson* v. *Denno,* 378 U.S. 368, 410, appendix A to opinion of Mr. Justice Black for a listing of the 20 state jurisdictions applying this rule.

[3]''Since the defendant has testified that he asked permission to speak to an attorney and that was denied him, the officers rebutting that testimony, the Court concludes that that will be an issue that can properly be determined by the jury in this case, the trier of fact. They will have to make the determination as to the credibility of the witnesses for the People on the one hand, the officers, or the credibility of the defendant on the other hand.

''The jury would, of course, be instructed by the Court in line with the *Escobedo* case that if the jurors were to be satisfied that any statements the defendant gave were given after he had requested the right to see an attorney and been refused that right, that under those circumstances they could not consider any statements. The Court certainly would so instruct the jury under the *Escobedo* case that is the present status of the law. But this Court can't say at this time, having heard the testimony of the officers and the defendant, that as a matter of law the evidence shows that the defendant made a request for an attorney and that that request was denied him. Had the officers testified that the defendant requested permission to contact an attorney and that they told him that he could only contact an attorney after they talked to him, then the Court could take that issue away from the jury and rule as a matter of law, under the *Escobedo* case, that any conversations the officers had with the defendant under those circumstances would be inadmissible as being involuntarily given. But we don't have that situation here.

''So, it is going to be a question of fact for the jury to determine based on proper instructions. But the Court doesn't hold as a matter of law under the voir dire testimony elicited here that the statements of the defendant were involuntarily given, which means, of course, that we are going to have to repeat in the presence of the jury all of this testimony that has been given again, because the jury is now going to have to decide it under proper instructions.''

Thus, since there was no resolution of the factual issues in connection with the circumstances surrounding the statement given at defendant's home, we cannot say that it was admissible as a matter of law.

The statement itself, as related by the police, was to the effect that McGee was purchasing the automobile from White whom he had known for a number of years.

While this statement is exculpatory on its face, it was nevertheless highly incriminating and prejudicially so. White's testimony proved it to be false, it did not square with a later statement given by McGee two days later or with his defense which was to the effect that he had borrowed the car from one Yancey who had told him that he, Yancey, was buying it from White. Furthermore, it seems fairly obvious that had none of the statements been admitted, McGee would not have taken the stand; in fact, he might have been persuaded not to offer any defense in view of the weakness of the prosecution's case. (*People* v. *Polk*, 63 Cal.2d 443, 448-449 [47 Cal.Rptr. 1, 406 P.2d 641]; *People* v. *Clark*, 62 Cal.2d 870, 881 [44 Cal.Rptr. 784, 402 P.2d 856]; *People* v. *Davis*, 62 Cal.2d 791, 796-797 [44 Cal.Rptr. 454, 402 P.2d 142]; cf. *People* v. *Nye*, 63 Cal.2d 166, 175-176 [45 Cal.Rptr. 328, 403 P.2d 736].)

The second statement was obtained at the police station on the day of arrest. Again defendant was not advised of his rights; again there are various factual disputes surrounding the making of the statement and again their resolution was left to the jury. Here too the People argue that the interrogation was investigatory. It seems to us that this contention cannot be sustained on any version of the facts, unless the *Konigsberg-Stewart-Cotter* line of cases permits repeated police questioning for the purpose of giving a suspect an opportunity to give a better explanation than one previously essayed. Again the statement was to the effect that McGee was purchasing the car from White.

Needless to say when defendant took the stand and testified that he had borrowed the car from Yancey, he was asked some embarrassing questions about the statements given to the police. Although he denied making the statement at the police station and testified that in the statement given at his home he did not say that he was purchasing the car from White, but did claim immediately that he had obtained possession from Yancey, the value of the statements to the

prosecution can hardly be exaggerated. The judgment must therefore be reversed.

It should be noted that at a retrial the prosecution's case — apart from the statements — should be somewhat stronger than at the first trial. Since defendant had admitted in one of the statements that he had written the address appearing on the last two lines of the receipt from the Department of Motor Vehicles, the prosecution did not offer any independent evidence that the handwriting was his. Such evidence should be easily available at the next trial, thereby connecting defendant with the change of license plates.

The judgment is reversed.

Shinn, P. J., and Ford, J., concurred.