[Crim. No. 10224.   Second Dist., Div. Two.   Aug. 22, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. CHARLES EDWARD FALK et al., Defendants and Appellants.

Ronald L. Goldman, under appointment of the District Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and S. Clark Moore, Deputy Attorney General, for Plaintiff and Respondent.

ROTH, P. J.—Appellants Falk and Helpman were tried jointly and found guilty by a jury of robbery in the first degree (Pen. Code, § 11). Both appeals are from the judgment of conviction.

On the afternoon of September 1, 1963, three men robbed the Alpha Beta Market on Lakewood Boulevard. Several witnesses, including the third robber, Patterson, testified that appellants were two of the participants in the crime.

Officer Vogel of the Long Beach Police Department, the investigating officer on the case, testified that he questioned appellant Falk in October of 1963 while the latter was in custody at the Los Angeles County jail.

'' [Falk] stated that he, Helpman and Patterson, had robbed the Alpha Beta Market on the first of September. That he and Patterson had contacted two other men who he didn't care to mention in regards to a car to be used on this robbery. . . .''

On rebuttal, Detective Sergeant Jack McMahan of the Long Beach Police Department testified that he participated in the interrogation of Falk, which lasted approximately 25 minutes. His testimony elaborated on the details of the crime and demonstrated that Falk's confession was made in response to continuing questioning by the police.

Falk's testimony on surrebuttal relating to the circumstances surrounding this interrogation differed considerably from that of Vogel and McMahan:

''They took me down to the interrogation room of the Los Angeles County Jail, and as we left the attorney room I asked the officer who was a Deputy Sheriff if I had to speak to these gentlemen. He said, 'Yes.' They handcuffed me. I went against my will, and they took me downstairs, and they handcuffed me to a chair and asked me, 'How are you?' And all that. And I said 'Hello.' And then he said I was positively identified at a robbery and that they had shown pictures; the people said it was me, and what did I have to say about it, and I said, 'I didn't rob any place.' He said it was a market. He told me that. I told him, 'I didn't rob the market,' and could he please take me back upstairs as my wife was due any minute in to visit—because if you are not there you didn't get it. And he said this wouldn't take very long. I said I would like to call a lawyer, and he said, 'Who?' And I mentioned the name Ernie Graves because I had used Mr. Graves before, and he says, 'You are going to be a hardhead, are you?' I said, 'You can take it any way you want. I am not going to plead guilty to something I didn't do.' So they asked me a few more questions about where my wife lives. I told them I didn't know. And that was about it. They gave me—they told me they'd be back, and asked me if I was on a Federal case, and I said, 'Yes' and they took me back upstairs.''

Falk denied making any confession.

■ Whether the jury believed Falk or the police, Falk's confession was clearly inadmissible under the rule of *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].

Unquestionably, the accusatory stage had been reached, for Falk had been identified from police photographs by several eyewitnesses to the robbery. Falk was clearly in custody. There is no evidence that he was advised of his right to counsel or his right to remain silent, and the confession, if made, was clearly the result of a process of interrogation which lent itself to eliciting incriminating statements. This is true under either version of the events in the interrogation room.

Respondent argues, however, that Falk was aware of his right to an attorney and to remain silent, and that he knowingly waived these rights. His argument is based on bits and pieces of evidence, scattered throughout a lengthy transcript, which show that in the first discussion at the Los Angeles County jail, Officer Vogel asked appellant if he had an attorney; that appellant said that he had but was unable to reach him; that later, he asked an officer if he could have his lawyer get a writ to take him to a dentist; that appellant was allowed to use the telephone; that appellant had been in the custody of federal agents who customarily advise defendants of their rights.

It is to be noted that this interrogation occurred prior to the decision in *Escobedo* v. *Illinois*, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977] and *People* v. *Dorado, supra.* As stated in *People* v. *Mathis,* 63 Cal.2d 416 at p. 432 [46 Cal.Rptr. 785, 406 P.2d 65] : ". . . it is difficult to hold that appellant waived rights of which admittedly he was not advised and of which, by virtue of the chronology of legal literature, he could not have been fully aware."

In addition, under Falk's version of the interrogation, his request for counsel was rebuffed, and the questioning continued. Under the police version, there is nothing to show that he chose to forego his rights when he made the confession. A similar problem was discussed in *People* v. *Buchanan,* 63 Cal.2d 880 at pp. 886, 887 [48 Cal.Rptr. 733, 409 P.2d 957], as follows:

"The fact that appellant had asked for counsel and chose not to make any statement during Monday and Tuesday sessions but may not have asserted these rights during the Thursday interrogation does not show that he knew his rights but decided to forego them when he made his statement. Although during the earlier sessions he may have thought that he had a right to counsel (even though that right in state proceedings had not then been established), Officer Griffin's admitted refusals to permit him to obtain counsel might well

have convinced defendant that he was wrong in this belief, or that continued assertions of his rights would prove futile. In these circumstances, to draw the conclusion that appellant (1) *knew* of his right to counsel and to remain silent and (2) 'intelligently and knowingly' (*Escobedo* v. *Illinois, supra,* 378 U.S. 478, 490 at fn. 14) decided to waive these rights would do violence to the rule that ' "courts indulge every reasonable presumption against waiver" of fundamental constitutional rights.' (*Johnson* v. *Zerbst,* 304 U.S. 458, 464 [58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357] ; *In re Johnson,* 62 Cal.2d 325, 334-335 [42 Cal.Rptr. 228, 398 P.2d 420] )."

Since the *Dorado* rule requires reversal ' "regardless of other evidence of guilt" ' (*People* v. *Dorado, supra,* at p. 356) when an improperly obtained confession is admitted into evidence, the judgment against Falk is reversed.

Turning now to the case against appellant Helpman, Officer Vogel also testified that he had a conversation with Helpman while the latter was in custody at the Los Angeles County jail. The questioning began at about 10:30 or 11 a.m. on September 19, 1963. At 11:40 a.m. Helpman signed the following statement[1] which was introduced into evidence:

"About one week before the robbery took place I met Charles Falk in L.A. I had a man with me by the name of Gene [Patterson]. I introduced Gene to Falk, and I didn't see them until the day before the robbery. At that time Falk told me that I had done him a good turn by introducing him to Gene, and they was going to let me go on a robbery with them. I did. They gave me an old gun with no firing pin. It was a revolver, .32. . . ."

The only evidence on direct—cross or otherwise, disclosed by the record as to what occurred immediately prior to or during the time that the written confession was obtained, is the following testimony of Officer Vogel:

"Q. . . . : What was the conversation that you had with him prior to getting the handwritten statement from him? What did it involve?

"A. Well, I told him who I was and what the purpose—I was there with regards to the investigation on the Alpha Beta Market robbery that occurred on September the 1st. And I told him what the circumstances were, and he said that he was in custody on a Federal beef. That he had enough time to face that he would like very much to get the matter cleared up.

---

[1] The beginning of the statement notes the time as 11:12 a.m.

And I told him, 'Well, the best way to do it is to tell me about it. We will see what we can do and we'll take a statement from you.'

"Q. Is that, then, when he made the handwritten statement or did something else transpire between that and the time he started to write?

"A. He told me all about the robbery, what he did, what Falk did, what Patterson did.

"Q. This was prior to his writing out in longhand?

"A. Yes, sir."

Officer Vogel also testified that at the time he interviewed Helpman, he had been told by federal officials in Albuquerque, New Mexico, where Patterson and Falk had been apprehended, that Patterson had implicated Helpman in the robbery of the Alpha Beta Market.

John McDonough, a United States Marshal, whose only duty was to maintain Helpman's custody while the latter was being transported to state court, testified that he had engaged in a friendly conversation with Helpman on several occasions, during the course of which Helpman confessed involvement in the robbery and stated how much money had been taken. McDonough stated:

"Well, . . . we talked very in-and-out of the case in general, and basically in the job our—as I say, we're not investigators. We are very informal at times to the degree of with our prisoners, but not to the extent of laxity.

". . . . . . . . . . . . . .

"And our conversations, like will be in this case, and then they will drift off to other things, and then back. It is just pieces here and there. But the whole drift was that he had stated that he was involved in this robbery and that he wanted to plead guilty originally but he wanted to talk—."

Appellant Helpman contends that the confessions made to Officer Vogel and Marshal McDonough were illegally obtained in violation of *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], and that their admission was reversible error.

*Dorado, supra,* p. 347, of course, holds that statements made to the police by a defendant while in custody, in the accusatory stage in the absence of proper advice of rights are inadmissible if made as the result of a process of interrogation that lends itself to eliciting incriminating statements. (*People* v. *Stewart,* 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97].)

Helpman was in police custody and had been accused speci-

fically of participating in the robbery with which he was charged and of which he was convicted by one of the perpetrators thereof. The police inquiry was not into an unsolved crime. Solid suspicion was focused on Helpman as one of the robbers (*Dorado,* p. 353). The record is devoid of evidence that he was advised of his *Dorado* rights. On the facts before us the settling question is whether Officer Vogel had carried out a process of interrogations that lent itself to eliciting incriminating statements.

Helpman was questioned for at least 40 minutes. The taking of the brief handwritten statement required at least 30 minutes. The purpose of the questioning was clear: Helpman had indicated that he would like to "get the matter cleared up" and Officer Vogel urged him forward. The interrogation not only "lent" itself to eliciting incriminating statements; self-incrimination was its apparent purpose.

A confession elicited as was this one even though voluntary does not avoid the proscription of *Dorado.* (*People* v. *Jacobson,* 63 Cal.2d 319, 327-328 [46 Cal.Rptr. 515, 405 P.2d 555]; *People* v. *Cotter,* 63 Cal.2d 386, 392 [46 Cal.Rptr. 622, 405 P.2d 862].) In *Jacobson* and *Cotter* statements were made spontaneously without any elicitation by the police. At bench, Helpman, in response to Officer Vogel's initiation of the topic, stated he would like to "get the matter cleared up." Vogel knew that Helpman had already been implicated by Patterson, Helpman's accomplice. Vogel did not advise Helpman that he need say nothing nor that he could obtain the services of an attorney if he wished. Vogel answered the "best way to do it is to tell me about it. We will see what we can do and we'll take a statement from you." We cannot characterize the confession that followed as valid within the meaning of *Jacobson* and *Cotter.*

In *People* v. *Crenshaw,* 241 Cal.App.2d 289 [50 Cal.Rptr. 429], the defendant confessed to pimping for a victim of an alleged robbery for which he had been arrested and about which he was being questioned. The interrogation was directed toward the commission of the robbery and defendant's activities as a pimp. He was asked if the victim of the robbery was one of his whores. He replied in the affirmative. In reversing the conviction for pimping we held that the confession was not voluntary and was taken in violation of *People* v. *Dorado, supra.* We said at page 294:

"In so ruling we wish to make unmistakably clear that nothing in our decision, or in the cited decisions of our higher

courts, is designed to prohibit law enforcement officers from obtaining voluntarily supplied information from any person, whether he be deemed an accused or a suspect and whether such information is solicited before or after his formal arrest. As we read the decision of the United States Supreme Court in *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and the decision of our Supreme Court in *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], their fundamental message is that such information, whether exculpatory or incriminatory, *should be solicited, obtained and, if relevant, subsequently received into evidence* subject only to the restriction that such information *shall not be obtained by means of an accusatory interrogation of a person conducted while he is unaware of his constitutional rights.*

"The only limitation imposed by these decisions upon the use of self-incriminating statements is simply that *after the accusatory stage has been reached,* the accused must be informed of his rights before any further interrogation designed to elicit incriminating statements can properly be conducted to obtain admissible evidence. Unless the accused is so informed of his rights at this stage, it cannot be said that he has intelligently chosen to waive their protection."

The confession of Helpman was illegally obtained, and its introduction into evidence requires reversal (*People* v *Dorado, supra,* at p. 356), unless the later confession made to U.S. Marshal John McDonough which was completely unsolicited cured, as a matter of law, the prejudice caused by the introduction of the handwritten confession.

Our Supreme Court said in *Jacobson, supra,* at pp. 329, 330, that the introduction of an illegally-obtained confession made *after* a validly obtained confession did not necessarily require reversal.

The case at bench differs from *Jacobson* in that an invalid confession was made *first,* and a confession which may be considered spontaneous and valid (the conversation with McDonough) came later. We have, therefore, a problem of multiple confessions, one bad and the other valid, admitted into evidence. Specifically the question presented is: does the first confession taint the second? It is settled that in certain situations that may be the result. (See, e.g., *People* v. *Jones,* 24 Cal.2d 601, 609 [150 P.2d 801]; *People* v. *Brommel,* 56 Cal.2d 629, 634 [15 Cal.Rptr. 909, 364 P.2d 845]; *People* v. *Boles,* 221 Cal.App.2d 455, 459-460 [34 Cal.Rptr. 528]; *People* v. *Manriquez,* 231 Cal.App.2d 725, 730 [42 Cal.Rptr. 157]. Contra,

*United States* v. *Bayer*, 331 U.S. 532, 540-541 [67 S.Ct. 1394, 91 L.Ed. 1654]; *United States* v. *Gorman*, 355 F.2d 151, 157.)

In *Bayer, supra,* the court points up the sensitivity of the problem. It says at p. 540:

"Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after these conditions have been removed. . . ." See also *Killough* v. *United States,* 315 F.2d 241, 244.)

We need not decide this question since *Jacobson* requires us to reverse Helpman's conviction even if his second confession was properly admitted. *Jacobson* holds that the test of reversal in multiple confession cases is the one set forth in *Fahy* v. *Connecticut,* 375 U.S. 85, at p. 86 [84 S.Ct. 229, 11 L.Ed.2d 171] : "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." (*People* v. *Jacobson, supra,* at p. 331.)

Helpman's first confession was complete. It was written in his own hand, signed by him and dated. The statements made to McDonough, while tantamount to a confession, were oral, free of detail, and subject to the filter of the marshal's recall. We conclude, therefore, that there is a "reasonable possibility" that the first confession "might have contributed to the conviction" of appellant Helpman.

The judgment is reversed as to both appellants.

Herndon, J., and Fleming, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied October 19, 1966.