[Crim. No. 11139. Second Dist., Div. Four. Dec. 15, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. OLIVER FAULKNER, Defendant and Appellant.

Donald F. Roeschke, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Suzanne E. Graber, Deputy Attorney General, for Plaintiff and Respondent.

JEFFERSON, J.—A jury found defendant guilty of the crime of assault with a deadly weapon with intent to commit murder (Pen. Code, § 217). He appeals from the judgment.

On the night of November 23, 1964, at approximately 9:30 or 10 the victim, Virgil O'Neal, walked out of a liquore store on the corner of Vernon and Long Beach Boulevard, after purchasing a bottle of wine. He stopped momentarily near a darkened shoeshine stand when he thought he heard a voice. As he stopped, there was a blue flash from the area of the shoeshine stand. The bottle in his hand suddenly exploded and, in the next instant, he received a gunshot wound in the chest. He fell a few times but managed to make it to his home about a block and a half from the liquor store. An ambulance was called and he was taken to the hospital where he remained for about three and a half weeks.

Dr. Elmer Hankins examined O'Neal while he was in the hospital. The doctor found a gunshot wound on the right side of his chest. The sweater he was wearing at the time he was shot was introduced in evidence. It had a hole in it and stains over the right breast area.

Officer Harper was called to the residence of O'Neal on the night of November 23d. He observed that O'Neal had been shot. Within a half hour, he received another radio dispatch, this call directing that he go to 4510 Compton. He was informed that the man who shot the victim was at this location and wanted to give himself up. When Officer Harper arrived at 4510 Compton he observed defendant standing on the sidewalk outside. He was talking with two officers. Several bystanders and two other officers were also standing around. When he approached them, Harper heard defendant saying that he had gone to Vernon and Long Beach earlier in the

evening. Subsequently, Harper placed defendant under arrest, handcuffed him and put him in his police car. He then advised defendant of his constitutional rights. He told defendant that he had a right to an attorney before making any statements, that he had the right to remain silent and that any statements he made could be used against him in court. Defendant then freely and voluntarily made a statement confessing that he had shot O'Neal. A portion of the statement was made in the police car enroute to the station and it was completed at the station.

Defendant told Harper in the statement that he had known the victim for about two months; the victim was the neighborhood bully, always demanding money or cigarettes whenever he walked down the street; he got tired of this; earlier that night he had been forced to give him a dollar for wine; afterward, he decided, "this was the time to end it"; he went home, got a gun and went back to the vicinity of the liquor store; when the victim came out of the store, he fired two shots; he thought he hit him at least once because he observed the wine bottle break; he got scared and then ran home; on the way he threw the gun away.

The same night, defendant accompanied Harper and several other officers in an unsuccessful search for the gun.

Officer Kelley and another investigating officer had a conversation with defendant in jail the next morning. Before talking with defendant, Kelley first informed him of his rights to counsel and silence, and that if he said anything it could be used against him. When asked to tell them about the shooting, defendant stated, that it "resulted from this man bugging him all the time." He refused to say any more.

The defense consisted of defendant's testimony. He denied any involvement in the crime. He did not own a gun. He was at home until 8:30 or 8:45 that evening and then went to a restaurant about a block away. He acknowledged his house is but five blocks from the liquor store at Vernon and Long Beach Boulevard. After he returned to his house from the restaurant, at about 9:30 or 10 p.m. the officers arrived. They threatened him and twisted his arm. Officer Harper took him to the police station, wrote out a confession and beat him to get him to sign it. He confessed because of the strain, but refused to sign the confession. He was not advised of his constitutional rights. The next day he told Officer Kelley he had committed the crime but he did so only because he was afraid of being beaten again if he did not confess.

In rebuttal Officer Harper testified that he had neither threatened nor used any force on defendant.

Defendant questions the sufficiency of the evidence to support (1) the finding that he in fact made the two extrajudicial statements, (2) that they were voluntary, and (3) that they were made in compliance with the rules respecting the warning of constitutional rights.

Defendant admitted in his testimony that he made the two confessions. He indicated he was forced to do so by the officers. Defendant's version of how he came to confess differed from that given by the officers. The jury chose to believe the officers. ■ "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]" (*People* v. *Huston,* 21 Cal.2d 690, 693 [134 P.2d 758].)

■ The officers' testimony certainly cannot be classed as inherently improbable or incredible as a matter of law, as defendant suggests. ■ "Testimony is not inherently improbable unless it appears that what was related or described could not have occurred. [Citation.]" (*People* v. *Johnson,* 187 Cal.App.2d 116, 122 [9 Cal.Rptr. 571]; *People* v. *Knighton,* 250 Cal.App.2d 221, 232 [58 Cal.Rptr. 700].)

■ Contrary to defendant's position, the testimony of the officers provides substantial evidence that he made the extrajudicial statements alluded to, made them voluntarily, and after first being advised of his rights in compliance with the requirements of *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758] and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].[1]

■ Concerning the *Dorado* issue, the argument is made that the record suggests defendant made incriminatory statements to police officers prior to Officer Harper's arrival on the scene, and that it does not show he was forewarned of his rights before he made them. Pointed to is Harper's testimony, that when he arrived, he heard defendant telling two police officers he had gone to Vernon and Long Beach Boulevard (the scene of the shooting) earlier that evening. (The record

---

[1]Since the trial in this case took place prior to the date of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], the standards set by that decision for the warning of constitutional rights are not controlling here. (*People* v. *Rollins,* 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].)

reflects that defendant's residence was five blocks from this location.)

Officer Harper's testimony does not indicate defendant was in custody when he arrived at the residence or that any officer had interrogated defendant up to that point. Harper arrested defendant and put handcuffs on him. Defendant, several officers and a number of bystanders were all standing outside. Harper had been told in the radio dispatch that the man who did the shooting wanted to give himself up.

No question was raised at the trial concerning what took place prior to Harper's arrival. According to defendant's testimony, he did not admit anything until after he was in Harper's police car. The officers defendant was talking to were not called to testify. No objection was made by defendant when the evidence concerning what the officer overheard came in. Absent objection, the People had no occasion to supply additional foundation. Under the circumstances, we may not speculate as to what occurred and defendant may not urge the point now for the first time.

Nor was any objection made at the time the two confessions were offered and received in evidence. Later, after both sides had rested, defendant made a motion "to strike the testimony of the officers as to the purported admissions or confessions of the defendant on the basis they were obtained without prior advising him of his constitutional rights" and also on the ground that they "were obtained through the use of force and threat of force." The motion to strike was denied. That ruling was a proper one in the light of the testimony of the officers.

Defendant maintains the prosecutor was guilty of prejudicial misconduct because he referred in his opening statement to a witness who it could be inferred had led the officers to defendant, but thereafter failed to call the witness to testify. After prefacing his opening statement with the caution, that the jury was not to consider what he would say as evidence because he was not a witness, but as merely his attempt to give an over-all picture of what the People would attempt to show, the prosecutor recited how the victim had been shot and taken to the hospital. He then stated: "The police arrived on the scene and at the scene they went around trying to find any witnesses to what may have happened. The victim, Mr. O'Neal, did not see who shot him. He has no idea who to this day held the gun by which he was shot in the chest. He looked around for witnesses. The officer talked to a

man named Edward Green. After talking to this Mr. Edward Green, the police went approximately four to five blocks from this liquor store, and after the conversation with Mr. Green, four to five blocks from the liquor store, they came to the defendant.'' The prosecutor then related how, after being questioned, defendant had confessed to the crime. At the close of the prosecution's case, the defense moved for a mistrial, citing as misconduct the prosecutor's failure to support his opening argument by calling the witness. The court denied the motion. The court's ruling was proper.

Absolutely no showing is made of bad faith on the part of the prosecutor. "Unless the record indicates that the statement not later supported by the evidence was made in bad faith or without intention of trying to support it by the evidence, it cannot be said that the district attorney was guilty of misconduct because he failed to produce such evidence. [Citation.]'' (*People* v. *Miller*, 245 Cal.App.2d 112, 128 [53 Cal.Rptr. 720]; *People* v. *Whitmore*, 251 Cal.App.2d 359 [59 Cal.Rptr. 411].)

 Defendant suffered no prejudice from the prosecutor's failure to follow up his argument. As indicated above, the prosecutor informed the jury at the beginning of the opening statement that what he would say was not to be considered as evidence. In the formal instructions, the jury was instructed: "As to any statement made by counsel in your presence concerning the facts in the case, you must not regard such a statement as evidence.'' (CALJIC No. 2 was given.) Also given, was the instruction (CALJIC No. 23) that neither the prosecution nor the defense is required to call as witnesses all persons who were present or had knowledge about what had occurred. We must presume the jury understood and heeded the instructions concerning the nature and effect of the opening statement.

The judgment is affirmed.

Files, P. J., concurred.

KINGSLEY, J.—I dissent. As I view the record in this case, it shows that, prior to the warning of constitutional rights given to defendant by Officer Harper after the latter had taken defendant into his custody and placed him in the police car, there had been discussions between defendant and police officers concerning the O'Neal shooting and defendant's part therein.

I agree with the majority opinion that we must regard the prosecutor's opening statement as having been made in good faith. But, if we do so, we are faced with a record which shows, affirmatively, that the police had suspected defendant on the basis of their conversation with the mysterious Mr. Green, had gone in search of him, had located him, and had secured a confession. Since Officer Harper was told, over a police radio, to go to defendant's home because the man who had shot O'Neal had confessed, it follows that there had been a confession before Officer Harper arrived on the scene. In addition, when Officer Harper did arrive at defendant's residence, he found defendant surrounded by police officers, obviously still discussing the crime and admitting (contrary to his later defense) that he had been at the place of the shooting during the evening.

It seems to me that, under the rules laid down in *People* v. *Davis* (1967) 66 Cal.2d 175 [57 Cal.Rptr. 130, 424 P.2d 682], *People* v. *Stockman* (1965) 63 Cal.2d 494 [47 Cal.Rptr. 365, 407 P.2d 277], *People* v. *Falk* (1966) 244 Cal.App.2d 398 [54 Cal.Rptr. 488], and *People* v. *McGee* (1965) 238 Cal.App.2d 203 [47 Cal.Rptr. 640], that there was a burden on the prosecution to show that these earlier discussions either had themselves been preceded by adequate *Dorado* warnings, or that they were, for some reason, either volunteered statements or responses to purely preliminary investigations. That was not done.

This is not a case where the possibility of some interrogation prior to that offered in evidence is a matter of pure speculation. As I have pointed out, the prosecution's own case shows affirmatively that there had been significant earlier conversations between the police and defendant. Once that appears in the record, the prosecution has a duty to go forward and explain the circumstances under which those conversations took place.

While it is true that this issue was not raised at the very first opportunity, it was raised, argued, and ruled on in the trial court during the trial. This, in my opinion, was sufficient to reserve it for our consideration here.

I would reverse.

Appellant's petition for a hearing by the Supreme Court was denied February 8, 1968.