[Crim. No. 7955.   In Bank.   Oct. 1, 1965]

THE PEOPLE, Plaintiff and Respondent, v. WILLIAM
EARL COTTER, JR., Defendant and Appellant.

Jack A. Dahlstrum, under appointment by the Supreme Court, and Dahlstrum & Walton for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Gordon Ringer, Deputy Attorney General, for Plaintiff and Respondent.

BURKE, J.—This is an automatic appeal in a death penalty case. (Pen Code, § 1239, subd. (b).) Defendant pleaded not guilty to a murder charge, and not guilty by reason of insanity. The jury returned verdicts finding him guilty of first degree murder and sane, and fixing the penalty at death.

Ben Buus, who was 69 years of age, lived with his wife Elizabeth in part of a rented house at 9630 Oak Street in Bellflower. Defendant Cotter lived in another part of the house, which was separated from the Buus quarters by a partition. He paid $43 a month in rent, of which $8.00 went to Buus because defendant's lights and gas were on his meter. Mr. and Mrs. Buus had no social contacts with him and had never had any disagreements with him.

On October 10, 1963, defendant told Buus he could not pay his rent as he had not received his unemployment check and had been eating at his sister's house for the past three days. He also said he would get his check the next day, a Friday. On Monday, October 14, he used Buus' telephone but said nothing about receiving the check.

By October 15, defendant's $8.00 utility bill was a week overdue. At 4:30 that afternoon Buus left the house through the rear or kitchen door to assist a neighbor. When he left, Mrs. Buus was playing the organ in the dining room.

Buus returned home at 4:45 or 4:50 p.m. Finding the back door locked instead of unlocked, as he had left it, Buus knocked on the door. As he reached for his key, he saw defendant come out of either the bedroom door or the dining room door and unlock the rear door. Defendant then stepped back about two or three steps toward the center of the room, knife in hand, and said: "Don't move or I will get you. I got your wife." (This will be referred to as the first statement of defendant.)

Hearing his wife moan, Buus hesitated for a moment, then went out the back door into the front yard and called for help. He returned to the back door where he saw Mrs. Buus lying in the doorway, face down; she was bleeding terribly.

Buus did not see defendant come out of the house but did see him run past while he was on the front lawn.

A neighbor responded to Buus' call for help, ran outside, and observed defendant half-run, half-walk to the sidewalk, turn for a second, glance back at the house, then run west on Oak. At Buus' request, the neighbor summoned the police and an ambulance, then went to the house where he helped pick Mrs. Buus off the floor and hold her until the ambulance came. Mrs. Buus had been lying on the kitchen floor and she was covered with blood "practically from top to bottom." At first she was conscious but she lost consciousness when the ambulance arrived. She died later that day as a result of 26 stab wounds.

Two Los Angeles County deputy sheriffs arrived at the Buus residence about 5:10 p.m. and took statements from Mr. Buus and several neighbors. The officers learned that Mrs. Buus had been stabbed and that defendant Cotter had admitted to Mr. Buus that he had stabbed her. Asked whether anything was missing from the house, Buus said that nothing had been taken, but a drawer in the bedroom dresser and two jewelry boxes on top of the dresser had been opened. When he had left to go to his neighbor's house, the boxes and drawer had been closed. The officers conducted a search of the premises which revealed the opened jewelry boxes and dresser drawer. The deputies then left to search the area for the assailant. While driving they received information that defendant had called the Lakewood Sheriff Station and indicated where he could be found. Defendant had given the desk officer his name, told him he had just tried to kill a woman, and that he could be found at a certain corner. (This will be referred to as defendant's second statement.)

Arriving at that designated location, the officers found defendant. In response to questions he acknowledged his identity, his address, that he had made the telephone call and had stabbed a woman at that particular location. When asked where the knife he had used was, he said it was in his right front pocket. (Defendant's third statement.) When the police officer then removed the knife from defendant's pocket the blade was still open.

The officers handcuffed defendant, placed him in the police car, and drove to the station. One of the officers testified that en route he asked defendant what had occurred at the Buus residence. Defendant answered that he had gone to the front door with the intention of robbing them and stated (de-

fendant's fourth statement) : "Mrs. Buus answered the door, invited him to come in, and he told her that he came to pay his rent.

"Mrs. Buus stated that her husband was in the back yard and that she would call him. She went to the kitchen door and called to him. He didn't answer, and she shut the door and came back to the living room where Mr. Cotter said that he had waited for her, and as she approached him, he took the knife from his pocket and began stabbing her. She commenced screaming and telling him that—asking him what he wanted, that she would give him anything that he wanted, and he didn't know why, but he just kept stabbing her until she stopped screaming and fell to the floor. He stated that he then went to the kitchen door and locked it and walked through all of the rooms in the house looking for some money, but he didn't find any, and that he then heard someone at the kitchen door attempting to get in, and he went to the kitchen, opened the door and saw Mr. Buus standing on the back step.

"When Mr. Buus started in the kitchen, he said that he didn't recall exactly what he said to him, but he believed that he had told Mr. Buus that if he didn't get back out of the way that he would kill him, and then he said that Mr. Buus then ran to the backyard and began screaming for help, and that he then, Mr. Cotter himself, . . . ran from the inside of the residence, . . ."

The officer testified that the statements made by defendant in the police car were entirely voluntary and were in narrative form with the officers interrupting only to ask him to repeat when something he said to them was not clear; that during the making of this statement to the officers in the police car the defendant seemed remorseful and sighed several times, stating "that he didn't know why he had done it." (Fourth statement ends.)

After the arrival at the police station, the police did engage in a process of interrogation and as a result of the questioning defendant made statements five through seven. The last of these interrogations was at 9:49 p.m. on the same day (October 15) and was in the presence of a police stenographer who later transcribed what was said. This was the seventh statement and it was read in evidence.

The several statements in the police station added nothing to the essentials of the crime which had previously been volunteered by defendant. In his seventh (the recorded) state-

ment he did give some additional details, such as that he had hoped to find both Mr. and Mrs. Buus at home and had intended to exhibit the knife and tell them to be quiet and hand over their money; that if they had complied with his request, ''why I would have just taken the money and left''; that he believed both of them were at home when he went to the house. He stated further concerning his search of the bedroom that he was looking for Mrs. Buus' purse. He admitted he had ''continued to stab Mrs. Buus after she had fallen to the floor.'' In his previous statement in the police car he had stated that ''he just kept stabbing her until she stopped screaming and fell to the floor.''

Defendant did not testify on the issue of guilt and no evidence was presented on his behalf.

The People presented no evidence at the penalty trial, but defendant called a number of witnesses. He also took the stand in his own behalf, acknowledged that he had decided to try to get money from Mr. and Mrs. Buus and that he took out his knife with the intent to demand money from them but with no intention of using the knife as a weapon. He stated he did not know why he stabbed Mrs. Buus, that he was not angry at her and that she and her husband had been very nice to him. He remembered showing the knife to Mr. Buus and threatening him. He remembered talking to the officers while being transported to the police station, and when asked if any questions were asked of him at that time he stated, ''No, other than they asked me what happened. Was I mad at her or was there a fight?'' In his testimony he indicated that detailed questions were asked of him by a second group of officers only after he had been taken to the police station.

At the trial the prosecution based its case for first degree murder on two different theories. The first was on the theory of felony murder (Pen. Code, § 189) based upon the evidence of the opened jewelry boxes and dresser drawer and defendant's admission to the police that he had entered the Buus residence with an open knife in his hand and with the intent to rob the occupants. The second theory was based upon defendant's admission that he entered the house with the opened knife in his hand and shortly after entry, and with no further provocation, started stabbing his victim, from which it might be inferred that the attack was premeditated.

It is contended that under authority of *Escobedo* v. *Illinois*, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and

*People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], reversible error was committed by allowing into evidence several of the statements and confessions defendant made to the officers.

A comparison of the seven statements made by the defendant indicates that the final statement, the seventh, although adding certain details, was essentially a composite of the first four statements, all of which were given by defendant prior to his being questioned at the police station. The various statements did not contradict each other in any substantial degree and none of the details added by the seventh could have had any material effect on the outcome of the trial.

We hold that the questioning which took place at the police station by the second set of officers, as well as those subsequent thereto, was after the accusatory stage had been reached and it was incumbent upon the police to advise defendant of his constitutional rights before proceeding with such interrogation. The statements thus obtained from him in the police station (the fifth, sixth and seventh) were in violation of *Dorado,* and under that decision their admission into evidence constituted error.

It is quite clear, however, that the statement volunteered by defendant to the victim's husband, while exhibiting an open knife blade in his hand, constituted a voluntary confession of an assault upon Mrs. Buus which, when her death resulted from the wounds inflicted during such assault, ripened into a confession of murder. When defendant said, ''Don't move or I will get you,'' his meaning was crystal clear. It required no elucidation, no application of rules of construction or interpretation. When, in that setting, and with the moans of his victim plainly audible, defendant added, ''I got your wife,'' he meant undoubtedly that he had assaulted her with the knife. These words must be given their plain meaning, and even if thereafter defendant had remained completely silent, nevertheless in the light of the circumstances and the context in which the words were uttered they constituted a confession of murder and left only the degree of the crime subject to other proof.

It should be further emphasized that this first confession of defendant was not made to police officers and is therefore not comparable to or controlled by the situation presented in either *Escobedo* v. *Illinois, supra,* 378 U.S. 478, or *People* v. *Dorado, supra,* 62 Cal.2d 338.

The second confession, made by telephone, and the third and fourth made to the police officers immediately upon their response to his call were clearly admissible as having been made during the investigatory stage as defined in *Dorado,* and in *People* v. *Stewart,* 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97].

The more crucial conversation (the fourth) with the officers in the police car, was admissible for the further reason of absence of one of the conditions deemed essential to render the statement inadmissible under the rules laid down in *Escobedo, Dorado* and *Stewart.* Clearly, the statement made in the police car was not the product of a process of interrogation aimed at eliciting incriminating statements from defendant. The police merely asked him what had happened at the Buus residence. They were affording him an opportunity which police officers normally and routinely offer to any person whom they are taking into custody to give any explanation of his conduct which he may desire to give. It is a routine means of commencing an investigation.

As heretofore indicated, defendant in his testimony at the penalty phase confirmed that in the police car the officers only asked him to tell them what had happened. Obviously, therefore, none of the statements down to and including that in the police car may be classified as anything other than voluntary confessions and admissions of defendant, in no way rendered inadmissible under the requirements of *Escobedo, Dorado* or *Stewart.* Those cases deal with the inadmissibility of statements made by an accused during the accusatory stage, which statements are inadmissible in evidence unless the accused was duly forewarned of his rights to counsel and to remain silent. They were aimed at restraining law enforcement officers, once the accusatory stage has been reached, from the use of inquisitorial techniques in seeking to prove the charge against the accused out of his own mouth. They were never intended to discourage a defendant from volunteering to the police his complicity in the perpetration of a crime nor to prohibit the police from receiving and acting upon such confessions. Certainly, here, there were no inquisitorial techniques or processes of interrogation, designed to elicit incriminating statements, engaged in by the arresting officers when they were in the police car.

The purpose of the *Escobedo-Dorado* rules has been defined as "primarily to prevent police tactics which, in the past, have spawned involuntary confessions." (*In re Lopez,* 62

Cal.2d 368, 372-373 [42 Cal.Rptr. 188, 398 P.2d 380].) To determine what tactics the courts were referring to we turn briefly to the facts in the particular cases. In *Escobedo* the defendant had been arrested and was in custody in the police station when the interrogation took place. One of the arresting officers told defendant that another person, naming him, had told the police that the defendant was the person who had shot the deceased. The defendant testified, without contradiction, "that the 'detectives said they had us pretty well, up pretty tight, and we might as well admit to this crime,' and that he replied, 'I am sorry but I would like to have advice from my lawyer.'" During the course of the interrogation defendant repeatedly asked to speak to his lawyer and the police said that his lawyer "didn't want to see" him. Testimony of the police officers confirmed these accounts in substantial detail. "At one point, as previously noted, [defendant] and his attorney came into each other's view for a few moments but the attorney was quickly ushered away. [Defendant] testified 'that he heard a detective telling the attorney that the latter would not be allowed to talk to [him] "until they were done"' and that he heard the attorney being refused permission to remain in the adjoining room. A police officer testified that he had told the lawyer that he could not see [defendant] until 'we were through interrogating' him." The defendant was handcuffed in a standing position, he was nervous, he had circles under his eyes and he was upset and agitated because he had not slept well in over a week. It was also undisputed that during the course of the interrogation a Spanish-speaking officer who knew defendant's family conferred alone with defendant for about a quarter of an hour in Spanish, promising defendant that he could go home if he " 'pinned it on Benedict DiGerlando,' that 'he would see to it that we would go home and be held only as witnesses, if anything, if we had made a statement against DiGerlando . . ., that we would be able to go home that night.'" Defendant testified that because of this assurance he made the statement which was held improperly received in evidence. The officer denied offering such assurance. (*Escobedo* v. *Illinois, supra,* 378 U.S. 478, 482.) It is clear that the Supreme Court of the United States was confronted in *Escobedo* with the admissibility of a statement which, while it fell short of being a coerced or involuntary confession, was the product of "police tactics which, in the past, have spawned involuntary confessions." (*In re Lopez, supra,* 62 Cal.2d 368, 372-373.)

Similarly, in *Dorado* (62 Cal.2d 338) the questioned statements were the product of accusatory, inquisitorial tactics. Defendant was an inmate of a state prison, correctional officers had discovered some very incriminating evidence indicating that he had murdered a fellow inmate, and a series of separate interrogations was entered upon, over a period of several days. They were held in the presence of a prison official and a deputy district attorney. During the first day the defendant gave a written statement. Two days later, when the third interrogation took place, defendant implicated a codefendant. At his trial defendant claimed that his statements had not been freely and voluntarily given, partly because he feared threats made by a prison official at the initial interrogation. The officers denied any coercion and the trial court admitted the defendant's statements as voluntary. Parenthetically, that court did find that the confession of a codefendant inmate was the result of coercion.

In *People* v. *Stewart, supra,* 62 Cal.2d 571, 577 [43 Cal. Rptr. 201, 400 P.2d 97], this court stressed that it is when ''the officers have undertaken a process of interrogations that lends itself to eliciting incriminating statements, [that] the accusatory or critical stage has been reached and the suspect is entitled to counsel,'' and took pains to distinguish the case of *United States* v. *Konigsberg*, 336 F.2d 844, 853. In the latter case as *Stewart* relates, ''Federal Bureau of Investigation agents apprehended the defendants in a garage containing stolen goods, arrested them and took them to the bureau's office. At that office, prior to an arraignment, the agents asked Konigsberg ' ''why he was in this garage and just what had taken place . . . and . . . if he wished to cleanse himself or explain . . . what his reasons for being there were, why the other individuals were there.'' ' '' *Stewart* also points out (p. 579): ''Among other reasons for not applying *Escobedo,* the court [in *Konigsberg*] said that the purpose of the interrogation, even though it took place after the arrest, was not to elicit a confession. The court stated, 'The uncontradicted purpose of the discussion was to give Konigsberg a chance to explain his presence in the garage if he could; to hear Konigsberg's side of the story. . . . If Konigsberg or any of the other people caught in the garage could account for their presence this was their opportunity.' '' In *Stewart* the court further noted: ''Whatever may be the subjective intent of the interrogators, we must, in order to determine if the police are carrying out 'a process of interrogations that

lends itself to eliciting incriminating statements' (*Escobedo* v. *Illinois, supra,* at p. 491), analyze the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances." (*People* v. *Stewart, supra,* 62 Cal.2d at p. 579.)

In *Stewart* the defendant had been in custody for five days and had been interrogated daily. When this court declared that the nature of the questions asked can be helpful in applying the *Escobedo* test, it is to be noted that it was reviewing an interrogation which started with an accusation, "Roy, you killed that old woman . . . ," and that the court pointed out that the extensive interrogations could serve no other purpose than to elicit incriminating statements.

It is noteworthy that in *Escobedo, Dorado* and *Stewart* the defendants were denying complicity and the police were openly accusing them and urging them to tell the truth. By contrast, here the defendant was merely asked to state what had happened. He was not being accused of a crime which he had previously denied committing, which was the case in *Escobedo, Dorado* and *Stewart,* but in fact was asked concerning a crime which he had already freely admitted having committed.

Neither this court, nor the United States Supreme Court, has ever taken the position that the desire of a guilty man to confess his crime should be stifled, impeded, discouraged, or hindered in any way. The contrary is true.

In a concurring opinion in *People* v. *Garner* (1961) 57 Cal.2d 135, 162-164 [18 Cal.Rptr. 40, 367 P.2d 680], then Associate Justice, now Chief Justice, Traynor stated:

"The perpetrator of a crime is normally the one who knows most about it, and his confession, voluntarily made, is often the best evidence of his guilt that can be obtained. (See *Commonwealth* v. *Dillon,* 4 Dall. (U.S.) 116, 117 [1 L.Ed. 765]; *Commonwealth* v. *Agoston,* 364 Pa. 464 [72 A.2d 575, 583]; *People* v. *Valletutti,* 297 N.Y. 226 [78 N.E.2d 485, 488]; *Haley* v. *Ohio,* 332 U.S. 596, 614 [68 S.Ct. 302, 92 L.Ed. 224] [dissenting opinion].) Only overwhelming social policies can justify the exclusion of such vital evidence. In the case of coerced confessions, the evidence may be unreliable; even if reliable, a free society cannot condone police methods that outrage the rights and dignity of a person whether they include physical brutality or psychological co-

ercion. (See *Spano* v. *New York,* 360 U.S. 315, 320-321 [79 S.Ct. 1202, 3 L.Ed.2d 1265]; Maguire, Evidence of Guilt, § 109.) When a confession is voluntary, however, courts are reluctant to exclude it. 'Interrogation *per se* is not, while violence *per se* is, an outlaw.' (*Ashcraft* v. *Tennessee,* 322 U.S. 143, 160 [64 S.Ct. 921, 88 L.Ed. 1192] [dissenting opinion]; see *Lyons* v. *Oklahoma,* 322 U.S. 596, 601 [64 S.Ct. 1208, 88 L.Ed. 1481]; *Lisenba* v. *California,* 314 U.S. 219, 239-241 [62 S.Ct. 280, 86 L.Ed. 166].)

"As many commentators and courts have recognized, there is a 'compulsion to confess' to crime. Wigmore states the point colorfully: 'The nervous pressure of guilt is enormous; the load of the deed done is heavy; the fear of detection fills the consciousness; and when detection comes, the pressure is relieved; and the deep sense of relief makes confession a satisfaction. At that moment, he will tell all, and tell it truly. To forbid soliciting him, to seek to prevent this relief, is to fly in the face of human nature.' (Wigmore on Evidence (3d ed.) § 851 at p. 319; see, e.g., *Commonwealth* v. *Agoston,* 364 Pa. 464 [72 A.2d 575, 581, 583].) A psychiatrist explains the phenomenon of confessions in terms of subconscious but overpowering guilt feelings and desire for punishment. 'There is . . . an impulse growing more and more intense suddenly to cry out his secret in the street before all people, or in milder cases, to confide it at least to one person, to free himself from the terrible burden. The work of confession is thus that emotional process in which the social and psychological significance of the crime becomes preconscious and in which all powers that resist the compulsion to confess are conquered.' (Reik, The Compulsion to Confess, p. 267.)

"So long as the methods used comply with due process standards, it is in the public interest for the police to encourage confessions and admissions during interrogation."

Chief Justice Traynor's statement was subsequently adopted by the unanimous opinion of this court in *People* v. *Ditson,* 57 Cal.2d 415, 434-435 [20 Cal.Rptr. 165, 369 P.2d 714].

*Escobedo, Dorado* and *Stewart* are also to be distinguished from the case at bench in that in none of them was the court confronted with the problem here presented of determining the legal effect of receiving in evidence a series of confessions and statements, some of which were made during the investigatory phase and were properly received and others of which were given during the accusatory stage and were improperly considered.

398

Such a problem was before the court in the recent case of *People* v. *Jacobson, ante,* p. 319 [46 Cal.Rptr. 515, 405 P.2d 555]. There, the improperly obtained statements were held to be merely cumulative, and since they occurred last in sequence it was held that they could not give rise to an implication that the legally obtained confessions were ''induced'' by any subsequently improperly obtained. (*People* v. *Jacobson, supra,* at p. 331.) Under such circumstances this court held that there is no reasonable possibility that the illegally obtained confessions contributed to the conviction. (See also *Fahy* v. *Connecticut* (1963) 375 U.S. 85, 91 [84 S.Ct. 229, 11 L.Ed.2d 171].)

Similarly, applying the test prescribed in *People* v. *Watson,* 46 Cal.2d 818, 835 [299 P.2d 243], we find that there is no reasonable probability that a result more favorable to the defendant would have been reached here had the illegally admitted confessions not been received in evidence. (Cal. Const., art. VI, § 4½.)

Defendant also contends that he was denied a fair hearing on the question of his sanity by not being allowed to open and close the argument to the jury. He made no request to do so. The Penal Code is silent on this point of procedure. Defendant concedes that the California case law is contrary to his contention. We reaffirm our previous determinations that defendant has no absolute right in the sanity phase of the trial to open and close the argument to the jury but he may be allowed this privilege in the discretion of the trial court. (*People* v. *Letourneau,* 34 Cal.2d 478, 495 [211 P.2d 865]; *People* v. *Kimball,* 5 Cal.2d 608, 611 [55 P.2d 483]; *People* v. *Goold,* 215 Cal. 763, 766 [12 P.2d 958]; *People* v. *Hickman,* 204 Cal. 470, 482 [268 P. 909, 270 P. 1117].)

Defendant also asserts that the court erred in (1) allowing the prosecutor to comment in argument upon his failure to testify during the guilt and sanity phases of the trial, and (2) giving an instruction on this subject on the guilt trial substantially of the type held to constitute error in *Griffin* v. *California,* 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106]. It is to be noted, however, that, here, the erroneous instruction was requested by both the defense and the prosecution. No objection was made to the challenged comments. The comments were temperate and, although both the instruction and comment were error, under the circumstances they furnish no ground for disturbing the judgment when the *People* v. *Watson* test previously alluded to is applied.

(*People* v. *Bostick*, 62 Cal.2d 820 [44 Cal.Rptr. 649, 402 P.2d 529].)

■ Finally, defendant contends that the prosecutor committed misconduct in his argument to the jury on the penalty phase. The court had permitted the introduction in evidence of a series of six pictures of different portions of the victim's nude body depicting the knife wounds. Each was received in evidence over objection of the defendant that the photographs were merely cumulative and would have no effect except to unduly inflame the jury and to prejudice it against the defendant. The trial judge at the time of receiving these photographs in evidence commented that he did not characterize them as "horrible or mutilated or inflammable in any way." In oral argument the prosecutor made a brief reference to the photographs, stating "You have all seen these horrible pictures, and they were shocking to you, as they would be to anybody to show the nude body of Mrs. Buus as she lay on the table in the coroner's morgue with all of those wounds shown." Certainly these comments did not go beyond permissible bounds considering the wounds inflicted and the trial court's oral appraisal of the photographs. ■ There was no abuse of judicial discretion in receiving them in evidence.

The judgment is affirmed.

Traynor, C. J., McComb, J., Tobriner, J., Peek, J., and Mosk, J., concurred.

Appellant's petition for a rehearing was denied November 10, 1965. Peters, J., was of the opinion that the petition should be granted.