[No. F006142. Fifth Dist. June 2, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT DALE MORRIS, Defendant and Appellant.

[Opinion certified for partial publication.*]

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.

**COUNSEL**

Richard L. Phillips, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Shirley A. Nelson and Clayton S. Tanaka, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

### Statement of the Case

HAMLIN, J.—Defendant and his brother, Richard Dean Morris, were jointly charged with the 1984 murder of Cindy Marie Morris, their sister-in-law, in violation of Penal Code section 187.[1] Following a separate jury trial of defendant, he was convicted as charged. Defendant appeals from the ensuing judgment sentencing him to prison for a term of 25 years to life.

On appeal, defendant contends his conviction must be reversed because the trial court erred prejudicially in admitting evidence of his statements during renewed booking interrogation and in instructing the jury. We disagree for the reasons stated below and affirm the judgment.

### The Facts

Paramedic Donald Campbell was dispatched to 5316 Ninth Street in Keyes about 6:30 a.m. on October 6, 1984. Upon entering the house Campbell found a female body, later identified as 22-year-old Cindy Morris,[2] lying in a bed and covered up to the neck. The body was cool to the touch and showed signs of bruising on the neck and face.

At about noon that same day, Dr. William Ernoehazy performed an autopsy and determined strangulation by hand caused Cindy's death. He also opined that numerous abrasions and contusions of Cindy's face and neck occurred as the result of at least three separate applications of force.

The day before Cindy's death, Cindy's mother observed that defendant appeared to be very angry with Cindy; after defendant said something to Cindy, she appeared nervous and told her mother she was having trouble with defendant. Moreover, in the weeks preceding the death and during conversations at which both defendant and Rick were present, defendant's sister, Bonnie Rose Lankford, heard remarks that she could "bank on" Cindy's death and also overheard a conversation about a drug which could not be detected in a victim's system. Bonnie believed her brothers were angry with Cindy because Cindy did not want them around Randy. Bonnie heard defendant say that he would like to kill "that bitch"; defendant thought

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] In addition to defendant, three other persons who will figure prominently in the facts of the case share the surname "Morris." For purposes of clarity, all three will be referred to by their first names; therefore defendant's brother Richard Dean Morris will be referred to as Rick; defendant's brother Randy Morris, husband of the victim, will be referred to as Randy; and the victim herself, Cindy Morris, will be referred to as Cindy.

Cindy was a bad influence on Randy and also claimed that Cindy was going out with other men.

Bonnie's boyfriend, Danny Doster, had also heard defendant talking about Cindy "going out on" Randy. Additionally defendant had asked Doster on several occasions prior to Cindy's death if Doster could get them some pills which they could use to kill Cindy. Like Bonnie, Doster was told he could "bank on" Cindy's death, and defendant offered Doster a thousand dollars to keep his mouth shut. Doster did not take defendant's threats seriously since defendant and Rick were always "running their mouths," i.e., threatening to do something to someone.

A second sister of defendant, Rick, and Randy, Susan Marie Kreiter, and Kreiter's husband, Douglas, testified under grants of immunity about the false alibi they furnished defendant at his request. When defendant and Rick first arrived at the Kreiter residence on October 6, 1984, defendant told Susan that he had killed Cindy and that he and Rick needed an alibi. Susan said both were dirty and sweaty and seemed nervous, pale, and shaky. Once joined by Douglas Kreiter, defendant related in detail the story of Cindy's death, telling the Kreiters how Cindy had struggled from the bedroom to the kitchen and then back into the bedroom. Rick told the Kreiters he watched defendant's back and at one time helped defendant hold Cindy down. When Cindy screamed, defendant put a pillow over her face to muffle the sound, and defendant told Susan he had kept socks on his hands during the killing to conceal fingerprints. He said he thought Cindy was dead at one point, but she sat up in bed and he had to 'redo" it. After the second strangling, defendant checked Cindy's pulse twice to be sure that she was dead before leaving the house. Defendant told Susan he had killed Cindy because she was mistreating Randy by stealing money from him, going out on him, and neglecting their daughter and because Cindy had told Randy to tell defendant and Rick to stay away.

Defendant asked Susan to tell the police that he and Rick had stayed at her house that night and had left town following a fight with their sister Bonnie. Defendant told the Kreiters he would give them in exchange for the alibi $10,000 (per Susan) or $5,000 (per Douglas) from the $20,000 he was supposed to get for killing Cindy.[3] Several witnesses testified that defendant was to get $20,000 of the insurance proceeds, Rick was to get $10,000 for his participation, and Randy would keep the remainder. However, the Kreiters told defendant they did not want the money. Defendant told Susan that Randy was supposed to be jogging at the time of the killing but came home too soon and had to be sent out again. Defendant told Randy to be

---

[3]Shortly before Cindy's death, Randy had taken out a $50,000 life insurance policy on her.

sure to be seen. Randy, dressed in a jogging suit, did in fact stop by at a neighbor's house about 6 a.m. on October 6, where he had a cup of coffee. The neighbor, Charles Gibson, knew Randy but testified he had never seen Randy out jogging before nor had Randy ever stopped by Gibson's house at that early hour.

Shortly after this discussion about their need for an alibi, defendant and Douglas Kreiter went to the store, and defendant told Kreiter the killing had been hard, and he had not realized she would fight as she did.

Both Susan and Douglas Kreiter initially gave police the false alibi which defendant had requested, stories which both Kreiters recanted when threatened with prosecution. Both Kreiters confirmed, however, that when defendant learned on the day of the killing that Randy had been arrested, defendant wanted to turn himself in but was dissuaded by family members. Apparently it was not clear whether Randy had been, in fact, arrested or whether he had merely been taken to the hospital.

Defendant also made incriminating statements to Timothy Leroy Martin which were overheard by Martin's girlfriend Lori Kaufman. Both Martin and Kaufman testified; defendant explained to Martin that he had killed Cindy by strangling her and left the body covered in order to keep it warm. Rick admitted he was involved in the killing by helping to hold Cindy down. Explaining his motivation, defendant said Cindy was "bringing Randy down by not keeping house and that general type of stuff," and defendant also told Martin he was supposed to get $20,000 of the insurance proceeds, while Rick got $10,000 and Randy kept the rest. Defendant had supplied drugs, primarily methamphetamine and marijuana, to both Martin and Kaufman, as well as most of the other non-law-enforcement witnesses in this case; many of these witnesses testified they might well have been under the influence of one or more of these drugs at the time they heard or engaged in those conversations to which they testified. Two additional statements by defendant were introduced into evidence, one of which, that made to a police officer, Gary Dean Wilkerson, is the focus of defendant's first issue on appeal and need not be reiterated here. However, Leland Cupp testified he was present in a holding cell at the Stanislaus County Municipal Court when he overheard defendant say to Rick and to other men, " 'The bitch sat up and I had to kill her again,' " and " 'It's not the first time she's done this. She's nothing but a whore.' "

Defendant took the stand in his own defense and testified that he had known Cindy for some time prior to her marriage to Randy. The relationship was not a friendly one, and defendant acknowledged some disagreements with Cindy because of her reluctance to let Randy associate with him and

with Rick. Defendant claimed he never had words directly with Cindy, but asked Randy to speak to her about it. Defendant also admitted that during the three months prior to Cindy's death he had made statements that he would like to kill her but was not serious when he made the statements. For the year preceding her death, defendant had used methamphetamine on a daily basis, maintaining about a $300 per day habit which he financed by selling drugs to others. Defendant also smoked marijuana every day and used heroin to "come down" from prolonged methamphetamine use.

Defendant had been using methamphetamine for the week preceding Cindy's death and had gone without sleep for most of that time. On the night of the killing, defendant argued with his sister Bonnie and then went to a park near his parents' home with Rick where the two smoked marijuana and Rick tried to calm defendant down. Rick went home after about an hour and a half, and defendant went to visit a friend to look for drugs. About 6 a.m. defendant arrived at Randy and Cindy's house where he told Cindy he had come to collect some money that Randy owed him. When Cindy told defendant Randy would not pay him and started "mean mouthing" defendant and threatening to tell Randy defendant had made advances to her, defendant slapped Cindy. When Cindy lunged at him, defendant grabbed her and strangled her. Defendant claimed he did not know what was going through his mind at the time, that he was just mad at Cindy and had not gone to their residence with any intention of killing her.

### DISCUSSION

I. *Did the trial court err in admitting evidence of defendant's statements during a renewed booking interrogation?*

 Relying primarily upon the decision of the California Supreme Court in *People* v. *Rucker* (1980) 26 Cal.3d 368 [162 Cal.Rptr.13, 605 P.2d 843], defendant first contends the trial court committed reversible error in permitting Officer Wilkerson to testify, over defense objection, to defendant's admission that he killed Cindy Morris. In *Rucker* the California Supreme Court affirmed the principle that *Miranda* admonishments[4] need not be given prior to a booking interrogation intended to elicit "from an arrestee the basic, neutral information that is necessary for proper jail administration, but [the state is forbidden] from using the arrestee's responses in any manner in a subsequent criminal proceeding. . . . [E]vidence of the 'booking' interview with appellant was not admissible on the substantive criminal charges." (*Id.* at p. 389.)

---

[4]*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

However, this court recently held that the exclusionary rule announced in *People* v. *Rucker, supra,* 26 Cal.3d 368, did not survive the passage of Proposition 8. (See *People* v. *Herbst* (1986) 186 Cal.App.3d 793, 800 [233 Cal.Rptr. 123].) In any event, *People* v. *Rucker, supra,* is not dispositive in the instant case since resort to the applicable federal standard establishes that the interrogation of which defendant complains went beyond the limits of a permissible booking interview and constituted a violation of defendant's *Miranda* rights under federal law.

In *People* v. *Rucker, supra,* the California Supreme Court reviewed the parameters of the booking interview. The court stated in part: "The *Miranda* safeguards are not necessary at a proper booking interview at which certain basic information is elicited having nothing to do with the circumstances surrounding any offense with which the defendant has been charged. [Citations.] ... The limited information needed at a booking procedure is required solely for the purposes of internal jail administration, not for use in connection with any criminal proceeding against the arrestee. When use of this information is confined to those proper purposes, its elicitation cannot be considered incriminatory." (*People* v. *Rucker, supra,* 26 Cal.3d at p. 387.) In contrast, the Supreme Court has defined an interrogation as " ' "a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements to support the [defendant's] arrest and ultimately his guilt." ' [Citation.]" (*People* v. *Pettingill* (1978) 21 Cal.3d 231, 244 [145 Cal.Rptr. 861, 578 P.2d 108].)

The distinction recognized by the California Supreme Court between a booking interview to gather neutral information and an interrogation which, intentionally or not, elicits damaging information from the accused is very similar to the federal definition of interrogation which triggers *Miranda* safeguards announced in *Rhode Island* v. *Innis* (1980) 446 U.S. 291 [64 L.Ed.2d 297, 100 S.Ct. 1682]. There the court stated in part: "We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the Police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But,

since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (*Id.* at pp. 300-302, fns. omitted [64 L.Ed.2d at pp. 307-308].) As the California Supreme Court has pointed out, "*Innis* broadened, rather than narrowed, the definition of 'interrogation' as employed in *Miranda*. Certainly the decision did not dispute the implication in *Miranda* that questioning is always likely to elicit a response, incriminating or not, from a suspect in custody." (*People* v. *Turner* (1984) 37 Cal.3d 302, 317 [208 Cal.Rptr. 196, 690 P.2d 669].)

At the hearing to determine the admissibility of defendant's testimony, Officer Wilkerson testified he had already completed the booking process and placed defendant in a holding cell when he, Wilkerson, remembered he had forgotten to place an identifying wrist bracelet on defendant. Consequently Wilkerson removed defendant from the holding cell and noted that defendant, who had been upset, nervous, and crying during the booking process, was somewhat calmed down. Wilkerson then asked defendant, "if we should anticipate any type of problem with his being there in jail." When defendant replied, " 'I don't think so,' " Wilkerson went on and asked defendant " 'Who are you accused of killing?' " Defendant "cried a little bit and then he stated, 'My brother, Randy Morris, was in last October for it.' And 'I never did anything like this before—I killed my sister-in-law.' " Defendant was "still very shaken up, very nervous." Wilkerson was unequivocal in his testimony that these questions were asked of defendant solely for the purpose of jail security and not to elicit information from defendant that might be used against him. Wilkerson defined jail security as his suspicion that "there might be some problem with the person that he was accused of killing having relatives or close friends in the jail or could be some type of retaliation." Wilkerson testified this is a procedure normally conducted when someone is about to be jailed for a serious offense such as murder or violent assault.

In rejecting defendant's contention that the statements were obtained in violation of his *Miranda* rights and therefore were inadmissible at trial, the trial court held that:

"THE COURT: It would appear that based on the cases that the People have cited in their trial brief on this issue, *People v. Stewart,* 1965 case, 62 Cal.2d 571, *People v. Siegenthaler,* . . . a 1972 case at 7 Cal.3d 465, *People v. Tarter,* 1972 case at 27 C.A.3d 935, questions asked during the booking process and not done for interrogation which elicit gratuitous type answers, are not considered to be interrogation and can be admissible in spite of their failure of a Miranda warning or Defendant requesting his rights under Miranda.

"Here the two questions asked, 'Would there be any trouble, yes or no,' that certainly didn't call for any type of incriminating answer. The question, 'Who are you accused of killing,' that would not call for an incriminating answer. Accordingly, based on the law as set forth in the cases just cited by the Court, and the nature of the questions asked, the Court will admit the testimony."

We believe the trial court's conclusion is erroneous under the standard announced by the United States Supreme Court in *Rhode Island* v. *Innis, supra.* Even the first question asked by Officer Wilkerson, i.e., whether jail personnel should anticipate any "trouble" in connection with defendant's incarceration, given the context of possible retaliation by members of the victim's family or the victim's friends, goes well beyond the type of neutral questioning permissible in a booking interview. Moreover, when defendant answered equivocally and Wilkerson pursued the matter, asking defendant who defendant had been accused of killing, it seems obvious that this is the type of police conduct which "the police should know [is] reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island* v. *Innis, supra,* 466 U.S. at p. 301 [64 L.Ed.2d at p. 308].)

The standard here is not what the police absolutely know; it is what they *should* know is *reasonably* likely to elicit an incriminating response from a suspect. As the court in *Rhode Island* v. *Innis* made clear, the focus in this inquiry is not on objective proof that the police were intending to elicit an incriminating response; rather the focus is on the subjective perceptions of the suspect. It is much too narrow a reading of *Rhode Island* v. *Innis* to conclude that simply phrasing a question addressed to a criminal suspect in terms of "accusation" removes the question from the realm of those which the police should reasonably expect to produce an incriminating response. This conclusion is certainly amplified when personal characteristics of the suspect are taken into consideration; a suspect who is visibly upset and, in fact, crying, as was defendant in the instant case, is less likely to appreciate the subtlety in a question such as the one here under consideration. (See also *United States* v. *Booth* (9th Cir. 1981) 669 F.2d 1231, 1236-1238; *Harryman* v. *Estelle* (5th Cir. 1980) 616 F.2d 870, 873-875; 2 Ringel, Searches and Seizures, Arrests and Confessions (1979) Custodial Interrogation under Miranda, § 27.4(b), pp. 27-28—27-32.)

The focus of our analysis is *not* what the police may lawfully ask a criminal suspect to ensure jail security. The police may ask whatever the needs of jail security dictate. However, when the police know or should know that such an inquiry is reasonably likely to elicit an incriminating response from the suspect, the suspect's responses are not admissible against him in a subsequent criminal proceeding unless the initial inquiry has been preceded by

*Miranda* admonishments. A police officer's concerns for jail security, encompassing the safety of the suspect, can be triggered by a variety of factors, some of which would have nothing to do with the offense underlying the suspect's incarceration and, as importantly, could only be explored by inquiring of the defendant himself. Thus a suspect who is booked into jail wearing tattoos or other indicia of gang affiliation might alert the booking officer to the possibility of gang-related violence; the quickest way for the officer to resolve such concern is to ask the suspect whether jail personnel should anticipate any trouble in this regard once the suspect becomes housed in the jail. So long as the offense for which the suspect is in custody is not itself gang-related, there is no reason the officer should foresee the question will elicit an incriminating response. In such a circumstance, an incriminating response is not the product of affirmative police conduct and would be admissible in the absence of *Miranda* warnings.

The difference in the instant case is the direct and recognized link between the booking officer's inquiry and the crime for which defendant had been arrested and was in custody. Conceding that jail personnel may have legitimate concerns about a suspect's safety vis-á-vis revenge or retaliation, the police obviously have a victim in mind when they arrest a suspect on suspicion of murder or some other assaultive crime. In most cases a booking officer concerned with jail security need not interrogate a suspect to determine the alleged victim since this information is, or certainly should be, obtainable from the arrest report or from the arresting officer. While the facts in this case do not suggest the questions were anything more than ill-advised, i.e., there is no evidence of affirmative subterfuge or deceit, permitting the police to elicit and use potentially incriminating unMirandized statements from a criminal suspect under the rubric of jail security would critically undermine the important safeguards established in *Miranda* v. *Arizona, supra,* 384 U.S. 436.

The People's response that defendant waived his *Miranda* rights cannot be considered by this court because this theory was not presented to the trial court. The rule precluding reliance on a new theory on appeal seems particularly apt in this case. The People point to a stipulation entered on the record during the rebuttal testimony of Detective Mac Reece who arrested defendant and "read him what is called his *Miranda* admonition and that the Defendant indicated he understood those rights and was willing to talk with Detective Reece." However, the People ignore earlier evidence that defendant subsequently invoked his right to remain silent and was only then transported to the jail facility where the booking procedure took place. This latter evidence was never formalized as a stipulation because the trial court properly ruled it would permit no evidence that defendant had invoked his right to remain silent. Consequently, it would be unfair to permit the People to

rely upon a stipulation clearly taken out of context to defeat defendant's argument that the interrogation discussed above was improper.

However, our conclusion that Wilkerson's questioning of defendant was an interrogation and not a neutral booking interview and was conducted after defendant invoked his right to remain silent under *Miranda* v. *Arizona* does not compel the further conclusion that admission of Wilkerson's testimony requires reversal of defendant's conviction. ■ First, defendant contends his statement to Wilkerson was a confession and thus its improper admission constituted reversible error per se. Defendant errs in characterizing this statement as a confession; it is more properly deemed an admission. As such, we review the effect of its erroneous admission into evidence under the standard of *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R. 3d 1065].

Defendant relies upon *People* v. *Cotter* (1965) 63 Cal.2d 386 [46 Cal.Rptr. 622, 405 P.2d 862] (vacated *Cotter* v. *California* (1967) 386 U.S. 274 [18 L.Ed.2d 43, 405 P.2d 862]), a case in which defendant's statement, " 'Don't move or I will get you. I got your wife' " (63 Cal.2d at p. 388) was deemed a confession. However, the court in *Cotter* took into consideration the surrounding circumstances in reaching this conclusion, to wit: defendant made the statement while exhibiting an open knife in his hand and with the moan of the dying woman audible in the background. Thus the court concluded that "in light of the circumstances and the context in which the words were uttered they constituted a confession of murder and left only the degree of the crime subject to other proof." (*Id.* at p. 392.)

■ However, as the Supreme Court later was to point out in *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 756 [175 Cal.Rptr. 738, 631 P.2d 446], " '[A] confession [amounts] to a declaration of defendant's intentional participation in a criminal act, whereas an admission is merely a recital of facts tending to establish guilt when considered with the remaining evidence in the case.' A confession must encompass all elements of the crime. [Citations.]" Thus in *Murtishaw* the defendant's statements to the police admitted the killing of several persons but claimed he (1) shot in response to gunfire, (2) lacked intent to kill the victims, and (3) suffered a confused state of mind. The court concluded that defendant's statements "might conceivably be considered a confession to manslaughter, [but] they cannot be viewed as a confession to first degree murder." (*Ibid.*)

■ Similarly, in the instant case, defendant's statement, "I killed my sister-in-law," some seven months after the offense constitutes nothing more than an admission of responsibility for her death. There are no surrounding

circumstances to explain the import of defendant's words. The mere admission of responsibility for Cindy's death is not a confession of first degree murder, and therefore admission of defendant's statement is not reversible per se.[5]

 As the court further pointed out in *People* v. *Murtishaw,* "the wrongful introduction of an *admission* [as opposed to a confession] is not reversible if the People can show beyond a reasonable doubt that the error complained of did not contribute to the verdict. [Citation.]" (*People* v. *Murtishaw, supra,* 29 Cal.3d at p. 756, italics added. See also *People* v. *Turner, supra,* 37 Cal.3d at p. 319; 2 Ringel, Searches and Seizures, Arrests and Confessions, *supra,* Suppression, § 30.2(e) at pp. 30-12—30-13.) Our conclusion that defendant's statements to Officer Wilkerson constituted an admission and not a confession makes it unnecessary to determine whether this case falls within the "rare case exception" to the per se reversal rule (*People* v. *Cotter, supra,* 63 Cal.2d 386; *People* v. *Jacobson* (1965) 63 Cal.2d 319, 329-331 [46 Cal.Rptr. 515, 405 P.2d 555]).[6] Applying the test of *Chapman* v. *California, supra,* 386 U.S. 18, we conclude the error in admitting defendant's admission to Wilkerson was harmless beyond a reasonable doubt. Defendant did not contest at trial that he had in fact killed his sister-in-law Cindy Morris; defendant took the stand and admitted the fact of the homicide, contesting only the mental state with which it was committed. Moreover, the jury had before it substantial evidence of much more damaging admissions, if not confessions, made to other family members and friends long before defendant was interrogated by Wilkerson. (Compare *People* v. *McClary* (1977) 20 Cal.3d 218, 230-231 [142 Cal.Rptr.

---

[5]Although it is not necessary to a decision in the instant case, the rule announced by the California Supreme Court in *People* v. *Murtishaw, supra,* at page 756, "the improper introduction of a confession is reversible error per se," may need to be reiterated if it is to remain viable in light of the United States Supreme Court's recent decision in *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101]. There the Supreme Court held that only four types of "constitutional errors require reversal without regard to the evidence in the particular case," (478 U.S. at p. 577 [92 L.Ed.2d at p. 470, 106 S.Ct. at p. 3106]), i.e., should be deemed reversible per se. Those errors are (1) introduction of a *coerced* confession, (2) complete denial of the right to counsel, (3) adjudication by a biased judge, and (4) direction by the trial court of a verdict for the prosecution in a criminal jury trial. (*Ibid.*) Notwithstanding some obscuring of the distinction, a confession obtained in violation of *Miranda* safeguards is not necessarily a coerced or involuntary confession. (See *Michigan* v. *Tucker* (1974) 417 U.S. 433 [41 L.Ed.2d 182, 94 S.Ct. 2357]; 2 Ringel, Searches and Seizures, Arrests and Confessions, *supra,* Applicable Standards, § 24.3, pp. 24-6—24-9.) Since the basis for per se reversal upon the erroneous admission of a coerced confession is the inherent violation of due process, the apparent California rule that improper admission of any confession, even one whose impropriety is based on a *Miranda* violation, requires per se reversal may have to be reexamined. Such a review is not required in this case.

[6]The availability of *any* "rare case" exception to per se reversal when a coerced confession has been introduced was seriously questioned by this court in *People* v. *Hinds* (1984) 154 Cal.App.3d 222, 239-241 [201 Cal.Rptr. 104].

163, 571 P.2d 620], a case in which the defendant's erroneously admitted admission constituted the only direct evidence of the defendant's involvement in the victim's death.) Since these other statements preceded defendant's admission to Wilkerson, they could not have been tainted by that improper interrogation and thus were properly before the jury. We are not persuaded by defendant's arguments in his reply brief that the credibility of these other witnesses was so seriously impeached by the defense that their testimony was virtually worthless. This approaches resolution of a credibility question beyond the power of this court.

II. *Did the trial court prejudically err in instructing the jury on consideration of evidence tending to show defendant's consciousness of guilt?*\*

. . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Woolpert, Acting P. J., and Harris, J.,† concurred.

A petition for a rehearing was denied June 25, 1987, and appellant's petition for review by the Supreme Court was denied September 23, 1987.

---

\*See footnote on page 380, *ante.*
†Assigned by the Chairperson of the Judicial Council.